# SUPPLIER AGREEMENT
## (INRI-4695-AI)

AGREEMENT made effective as of the 1st day of August, 2008, between INTECH Resources, Inc. (hereinafter INTECH), FEIN: 54-1861283 with offices at 5885 Trinity Parkway, Suite 220, Centreville, VA 20120 and Adaequare, Inc (hereinafter "Supplier") with offices at 1183 E. Lyons Road, Dayton, OH 45458 FEIN: 54-2047518.

Whereas INTECH is in the business of locating for various clients, including the client listed in any Purchase Order executed by INTECH and Supplier and the attached to this Agreement (hereinafter "Client"), according to the Client's specifications, technical services to the client, and performing as stated herein; and

Whereas Supplier agrees that INTECH will spend significant resources and time performing duties associated with evaluating, qualifying, proposing and/or providing Supplier's personnel to Client, and that Supplier was not selected by Client to provide personnel to Client at the Client locations listed in any attached Purchase Order, and is not doing so directly or indirectly through another vendor; and

Whereas Supplier is in a similar business and desires to join efforts with INTECH for the purpose of providing qualified candidates for Client's of INTECH;

Where as INTECH and Supplier wish to enter into an agreement pursuant to which Supplier will introduce technical personnel candidates to INTECH and INTECH may submit said technical services personnel to provide their services to Client;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein INTECH and Supplier agree as follows:

1. **DIRECT CONTACTS.** The Supplier agrees that it will not engage in any contacts with the Client's technical or administrative (including contracting, procurement, accounting, human resources) personnel concerning the efforts relating to the provision of technical services to Client by any of Supplier's technical personnel who are performing such services through INTECH or whom INTECH will propose or has proposed to Client to perform such services, but Supplier will communicate with the Client through INTECH in regard to such services.

2. **BILLING AND PAYMENT.** If Supplier's candidates are selected by Client to provide services, Supplier will be compensated by INTECH in accordance with a Purchase Order to be attached hereto for each personnel who proves such services through INTECH. INTECH will submit compensation to Supplier in the form of monthly payments based on the billable hours approved by Client on timesheets submitted by the technical personnel. INTECH will pay Supplier within thirty five (35) days of receipt of a correct invoice from Supplier or within five (5) days of receipt of payment from Client, whichever is later. In the event Client shall refuse to pay or shall demand a refund for any services performed by Supplier's personnel, whether or not Client previously approved or paid for the billable hours then Supplier shall not be entitled to payment for those hours and shall refund to INTECH immediately upon request, any payments made by INTECH to Supplier for such services for which Client refuses to pay. If Supplier refuses to refund such payments, among other remedies INTECH may deduct these amounts from any other payments due from INTECH to Supplier

3. **WARRANTY OF SERVICES.** INTECH will submit Supplier's technical personnel to Client according to the qualifications, experiences, and project requirements of Client and given to INTECH. It is within INTECH's discretion whether to propose such personnel to Client. The work to be performed by the technical personnel providing services under this Agreement shall be set out by Client and stated in a Purchase Order (or similar form). The technical personnel shall report on the results of their work, to the extent required by Client, to Client's Project Manager or other designated official. However, in the event that Client determines to terminate the services of Supplier's personnel for any reason, including unsatisfactory performance, Supplier will be compensated only for services approved and paid for by Client.

4. **CONFIENTIALITY.** INTECH is required to maintain the confidentiality of information obtained from its Client, as well as information regarding its own business. Therefore, Supplier and its personnel agree not to disclose to any third party any information relating to INTECH, its agents, or its clients, if such information was obtained in connection with Supplier's activities under the Agreement or the services of its personnel hereunder and if such information could reasonably be construed as confidential. Confidential information

*P. [signature]*
Supplier Initials

Page 1 of 4

4/16/2008

includes, but is not limited to, information regarding the existence of and details about any openings for which candidate may be proposed or interview or has learned about through such interview, and the identification of the clients in regard to the openings.

5. **NON-SOLICITATION AND NON-COMPETITION.**

   A. During the term of this Agreement and for a period of (6) months after its termination, Supplier and INTECH agree that neither party will hire or solicit for hire any of the other's personnel about whom it has received information or to whom it was introduced as the direct result of any services performed pursuant to this Agreement.

   B. The parties recognize, that there may be new occasions after the execution of this Agreement in which Supplier is contacted to supply technical personnel directly or indirectly to Client, including but not limited to situation in which Client requests candidates directly from Supplier, when another vendor to Client requests candidates from Supplier to perform services for Client, or when Supplier is added to such "vendor list" (hereinafter "new eligibility occasions"). Supplier agrees that even though a new eligibility occasion may arise for it, for a restricted period in a restricted location it will not propose or assign any of its technical personnel to provide services for Client, directly or indirectly, other than through INTECH.

   C. For the purposes of this paragraph 5, the term "Client" includes any customers, subcontractors, or clients of the Client for whom Supplier's personnel performed or are, proposed by INTECH to perform services under this Agreement. The "restricted period" shall be one (1) year after either the date on which a particular technical personnel last performed services for Client under this Agreement or the date on which INTECH last proposed a particular personnel to Client or an interview with Client arranged by INTECH took place, whichever is later. Because Supplier personnel may be involved in multiple performances of services or proposals, the "restricted period" will be measured from the date of the last performance of services or proposal. The "restricted location" shall be any Client facility located within 150 miles of the client facility at which or for which such personnel performed services, was assigned to perform services, or was introduced to or interviewed by the Client to perform services.

6. **NOTICE OF TERMINATION.** This agreement may be terminated at any time by either party provided that the other party is notified in writing thirty (30) days prior to the termination date except that INTECH may terminate upon shorter notice if Client requests the services of Supplier's personnel to be terminated with less than 30 days notice. The provisions in the other paragraphs shall survive the termination of this Agreement.

7. **LIABILITY.** In connection with the services provided by Supplier's personnel, in no event shall INTECH be liable to Supplier for damages in an amount grater than the amount paid by INTECH for the performance of services by such personnel; provided, however, that Supplier shall not be liable for any special or consequential damages except that this limitation shall not apply in any case where Supplier indemnifies INTECH for liability incurred by INTECH to any third party which is due to any act or omission of Supplier's personnel.

8. **INSURANCE.** Supplier Agrees to indemnify, hold harmless and defend the CLIENT and INTECH, their directors, officers, agents, and employees from and against any and all injuries, damages, losses, liabilities, claims, costs and expenses, including reasonable attorney's fees, arising from or related to any act or omission by Subcontractor, or any of its representation, warranties or agreements hereunder, including (without limitation) damages resulting from Subcontractor's failure to safeguard confidential information as required by Section 8 hereof.

   Subcontractor shall carry, at its expense, complete and comprehensive insurance in the minimum amounts and types set forth below:

   (i) Comprehensive General Liability coverage in the minimum amount of $1,000,000 each occurrence and annual aggregate, including a Broad Form General Liability Endorsement and Broad Form Property Damage Extension.

*P. Panne*
Supplier Initials

Page 2 of 4                                                                                    4/16/2008

(ii) Workers' Compensation Insurance providing statutory benefits.
(iii) Employer's Liability Insurance in the minimum amount of $100,000/$500,000/$1,000,000.
(iv) Owned or Non-owned Automobile Liability Insurance in the minimum amount of $1,000,000 each accident.
(v) Umbrella liability coverage in the minimum amount of $1,000,000 each occurrence and annual aggregate.
(vi) Errors and Omissions Insurance in the amount of at least $1,000,000 per claim with an annual aggregate of at least $1,000,000 inclusive of legal defense costs.

All such policies of insurance
(A) shall be carried with companies rated A or better by A.M. Best;
(B) shall name INTECH as an additional insured, except that INTECH need not be named an additional insured under Subcontractor's compensation policy;
(C) shall contain a requirement that INTECH be given written notice at least thirty (30) days prior to cancellation; and
(D) shall be maintained for the entire Term of this Agreement and a period of at least five (5) years after the expiration or termination of the Term. Subcontractor shall provide to INTECH certificates evidencing the coverages required hereunder (and, if requested, certified copies of the policies) concurrently with the execution of this Agreement and thereafter periodically upon the request of INTECH. The insurance requirements contained in this section or in any Work Order shall in no way be deemed to limit subcontractor's liability, under this Agreement or any Work Order.

9. **EMPLOYEES.** Supplier agrees that any personnel provided by Supplier are employees of Supplier and are not employees of INTECH or client; that Supplier at all times retains the primary control over its personnel including the right to recruit, qualify, hire, terminate, set compensation and benefits, establish codes of conduct, monitor, discipline, establish minimum or maximum work hours and other condition of work; that Supplier's personnel will not be entitled to any rights, benefits or privileges provided by INTECH or Client to their own employees; that INTECH or Client will not be liable for payment of employment taxes, workers compensation or other benefits provided to Suppliers personnel and that Suppler is responsible for these matter and is paying/withholding FICA, FUTA, FIT and similar taxes; that Supplier's employees will abide by the confidentiality and restrictive covenant provision of this Agreement; and that Supplier will advise its personnel and obtain their agreement of the foregoing prior to the commencement of their services hereunder.

10. **ASSIGNMENT.** Neither this Agreement nor any interest hereunder may be assigned or otherwise transferred by Supplier to third parties without the prior written consent of INTECH. This Agreement shall be binding upon and inure the benefit of heirs, successors, assigns, and delegates of the parties hereto.

11. **NOTICES.** Any requirement to notify or for "notice" or "notification" in connection with the subject matter of this Agreement shall be in writing and shall be effective when delivered personally to the party for whom intended, or five (5) days following deposit of the same into the United States mail, certified mail, return receipt requested, addressed to such party at the address set forth below its signature to this agreement. Either party may designate a different address by notice to the other give in accordance herewith.

12. **SEVERABILITY.** If any term or Provision of this Agreement shall be found by a court of competent jurisdiction to be illegal or otherwise unenforceable, the same shall not invalidate the whole of this Agreement, but such term or provision shall be deemed modified to the extent necessary in the court's opinion to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the parties herein set forth.

13. **RIGHTS TO OWENERSHIP OF DOCUMENTATION.** Supplier and INTECH hereby agree that all material, documentation and other tangible expressions of information including but not limited to software programs and software documentation, technical data or marketing data as applicable, whether in final production or draft, which result from any work performed by INTECH or Supplier for the Client, shall be deemed to be works made for hire and all rights title interest shall belong exclusively to Client unless some other arrangements have been agreed to by all parties in writing.


Supplier Initials

Page 3 of 4

4/16/2008

14. **COMPLETE AGREEMENT AND AMENDMENT.** This Agreement, the Client's Master Agreement executed between Client and INTECH if attached hereto, and any written Purchase Orders, Addendum or Exhibits executed hereunder, contain the entire agreement between that parties hereto with respect to the matter covered herein. Supplier acknowledges that it is entering into this Agreement solely on the basis of the agreements and representations contained herein. This Agreement shall not be modified in any way except in writing signed by both parties and stating expressly that it constitutes a modification of this Agreement.

15. **LAW.** This Agreement shall be governed by the laws of the Commonwealth of Virginia and any lawsuits pertaining to this Agreement or the services provided hereunder shall be brought only in the state or district courts in Fairfax County in the Commonwealth of Virginia. Supplier hereby consents to the exercise of personal jurisdiction over it by such courts.

16. **Breach.** Because monetary damages are difficult to ascertain and are likely to be inadequate to compensate either r Party in the case of any breach of this Agreement by the other party, the parties agree that each party shall be entitled to injunctive relief (both temporary and permanent) for any breach or proposed breach of this Agreement. In addition, the party who is found to have breached this Agreement shall be liable for any damages, costs and fees incurred by the other non-breaching party and relating to such breach. Each party also agrees to indemnify and hold harmless the other and for any and all losses, costs and other liabilities incurred, including costs and fees, relating to any breach of the obligations set forth herein.

**IN WITNESS HEREOF**, the parties have cause this Agreement to be executed by their duly authorized agents as of the date first written above.

INTECH Resources, Inc.                              Supplier: Adaequare, Inc.

By: _Melissa Jolson_ (Signature)                    By: _P. Pavan_ (Signature)

By: _Melissa F. Grow_ (Print Name)                  By: _Pavan Peechara_ (Print Name)

**Addendum to Supplier Agreement**
**INRI-4695-AI Modification 1**

This addendum applies to the Supplier Agreement entered into this 1st the day of August, 2008 and between INTECH Resources, Inc., a Virginia corporation with offices at **5885 Trinity Parkway Suite 220, Centreville, VA 20120** (hereinafter referred to as "INTECH") and Adaequare, Inc., a corporation organized and existing under the laws of the state of Ohio with offices at 1183 E. Lyons Road, Dayton, OH 45458 (hereinafter referred to as "Supplier").

For the purposes of all Suppliers performing services under the Prime contract with Fannie Mae date June 18, 2007, the following additional clauses shall apply, as copied directly from the Prime contract.

**4(o) Right to Hire; Fees** – The following terms apply with respect to Contractors referred by Subcontractor who are subsequently hired by Fannie Mae:

(i)   Fannie Mae may hire Staff Augmentation Contractors furnished by Vendor or its subcontractors at any time. IN the event a Staff Augmentation Contractor furnished by Vendor is hired by Fannie Mae under circumstances other than those described in Sections 4(o) (ii) below, Vendor shall be entitled to receive, as its sole compensation for such hiring, s fee equal to the Bill Rate for such person as of the date hired by Fannie Mae multiplied times a specified number of hours, based on the length of time that such Staff Augmentation Contractor has provided Services to Fannie Mae under this Agreement. The following formula shall be used to calculate such fee:

| Length of Time the Contract Worker Provided Services to Fannie Mae | Number of Hours to be Multiplied Times the Bill Rate to Determine Amount Payable as Fee |
|---|---|
| 1-day – months | 320 hours |
| 3 – 6 months | 160 hours |
| More than mix months | 0 hours |

(ii)   Vendor acknowledges and understands that if this Agreement or a Work Order is terminated, in whole or in part, by Fannie Mae for cause of expires and is not renewed or extended, and Vendor has Staff Augmentation Contractors may wish to continue providing services to Fannie Mae by seeking employment with Fannie Mae by seeking employment with Fannie Mae or another vendor that has a contract with Fannie Mae or the MSP. Vendor agrees in such instances that Fannie Mae and/or the MSP may immediately take such steps deemed necessary or appropriate to facilitate the transfer of such Staff Augmentation Contractors to employment with Fannie Mae or another vendor. In such instances, Fannie Mae shall not owe Vendor any fees under Section 4 (o) (i) or otherwise for a Staff Augmentation Contractor hired by Fannie Mae or another vendor.

(iii)   Fannie Mae shall now owe Vendor any fees under Section 4(o) (i) or otherwise for a Staff Augmentation Contractor hired by Fannie Mae or another vendor if the Staff Augmentation Contractor was a Payrolled Contractor.

(iv)   Vendor shall release any Staff Augmentation Contractor hired by Fannie Mae or another vendor as described in this Section from any applicable restrictive covenants and any related liability or damages. Vendor represents and warrants to Fannie Mae that neither Fannie Mae, the MSP nor any of their respective officers, directors, agents or employees shall incur or be liable, directly of indirectly, for the payment to any third party of any fees, penalties, or other damages (other than those fees payable by Fannie Mae to Vendor as specified above) in the event that Fannie Mae exercise the rights described in this Section.

**Annual FICA and FUTA Recuperation Rebate** – Vendor shall cooperate with Fannie Mae and the MSP to provide Fannie Mae with an annual rebate based upon Vendor's proportionate billings

in excess of the FICA and FUTA maximums for Staff Augmentation Contractors. Sub vendors will be responsible for refunding these amounts to the prime vendor for payment to Fannie Mae.

**Post Termination Obligations** – If this Agreement or an Order Form is terminated prior to completion of the Services, Fannie Mae will pay Vendor only for those authorized Services rendered to Fannie Mae's reasonable satisfaction prior to termination. Immediately upon termination of this Agreement or an Order Form, Vendor shall deliver to Fannie Mae, to the extent relevant to Order Forms affected by such termination, all: (a) work in progress; (b) Fannie Mae assets, Fannie Mae Resources and Fannie Mae Material; and (c) materials containing or embodying Fannie Mae Confidential Information or Deliverables. Vendor shall not make or retain any partial or entire copies of any of the foregoing and will destroy all computer files containing such data or information. The parties will continue to be bound by those sections of this Agreement that survive termination.

**On-Boarding/Off-Boarding** - For each candidate placed to Fannie Mae, the vendor shall pay the required fee for on-boarding, and the $150 fee for off boarding.
This fee will be the responsibility of the Supplier, and will be deducted from the first and final invoices.

**Criminal Background Check and Drug Screens** - Fannie Mae requires that each candidate have a criminal background check and drug screen completed prior to their start date.
The check will be completed by INTECH, but will be at the cost of the Supplier, to be deducted from the first invoice.

Additional amendments or additions to the Professional Service Agreements.
**Billing and Payment:** All fees for contractors placed at Fannie Mae will be paid to the Supplier within 24 to 48 hours of INTECH receiving funds from Fannie Mae.

**Prime Contractor Fees** - INTECH shall retain a fee of $2.00 per billable hour on each consultant placed through this Subcontract agreement.

**Business Development Efforts** - At not time shall the Supplier engage in any business development efforts, or communication with the Fannie Mae Manager, or the vendor manager service provider Allegis.

**IN WITNESS HEREOF,** the parties have caused this Agreement to be executed by their duly authorized agents as of the date first written above.

INTECH Resources Inc.                    Supplier: Adaequare, Inc.

By: _Melissa F. Grow_ (signature)        By: _P. Pannu_ (signature)

By: _Melissa F. Grow_                    By: _Pavan Peechara_